1

2

3

4

5

6          IN THE UNITED STATES DISTRICT COURT

7          FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9

10   PERRY ROBERT AVILA,                    No. C 05-2063 WHA (PR)

11              Plaintiff,                   **ORDER GRANTING
                                            DEFENDANTS' MOTION FOR
12   vs.                                     SUMMARY JUDGMENT**

13   JEANNE WOODFORD, Director of
     Corrections; J. McGRATH, former
14   warden; R. KIRKLAND, Warden; T.
     SCHWARTZ, Associate Warden; B. J.
15   O'NEILL, Associate Warden; M.
     FOSS, Lieutenant; L. E. SCRIBNER,
16   Captain; and D. CHRISTOPHERSON,
     Sergeant,
17
                Defendants.
18   _____/

19

20          This is a civil rights case filed pro se by a state prisoner.  Defendants have moved for

21   summary judgment.  Plaintiff has opposed the motion and filed his own motion for summary

22   judgment, which is opposed.  For the reasons set forth below, defendants' motion for summary

23   judgment is **GRANTED** and plaintiff's motion is **DENIED**.

                                    **DISCUSSION**

25   I.    **PLAINTIFF'S MOTIONS**

26          In addition to his motion for summary judgment, plaintiff has filed a combined motion

27   to compel, for appointment of counsel, and to expedite consideration of his case.

28   ///

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1   A previous request for "appointment" of counsel was denied; plaintiff has renewed the

2   motion.

3   There is no constitutional right to counsel in a civil case. *Lassiter v. Dep't of Social*

4   *Services*, 452 U.S. 18, 25 (1981). 28 U.S.C. § 1915 confers on a district court only the power to

5   "request" that counsel represent a litigant who is proceeding in forma pauperis. 28 U.S.C. §

6   1915(e)(1). This does not give the courts the power to make "coercive appointments of

7   counsel." *Mallard v. United States Dist. Court*, 490 U.S. 296, 310 (1989). In short, the Court

8   has only the power to ask pro bono counsel to represent plaintiff, not the power to "appoint"

9   counsel.

10   Plaintiff has done an exceptional job of presenting his position, and clearly is not in

11   need of counsel in the interests of justice. The motion will be denied.

12   In his motion to compel plaintiff fails to show that the material he seeks would have any

13   bearing on the result here, which is straightforward and clear. The motion will be denied. The

14   motion to expedite consideration is moot, as this ruling disposes of the case.

15   **II.   MOTIONS FOR SUMMARY JUDGMENT**

16   **A.   STANDARD OF REVIEW**

17   Summary judgment is proper where the pleadings, discovery and affidavits show that

18   there is "no genuine issue as to any material fact and that the moving party is entitled to

19   judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect

20   the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute

21   as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a

22   verdict for the nonmoving party. *Ibid.*

23   The moving party for summary judgment bears the initial burden of identifying those

24   portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine

25   issue of material fact. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986); *Nissan Fire &*

26   *Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). When the moving party has

27   met this burden of production, the nonmoving party must go beyond the pleadings and, by its

28   own affidavits or discovery, set forth specific facts showing that there is a genuine issue for

1   trial..  If the nonmoving party fails to produce enough evidence to show a genuine issue of

2   material fact, the moving party wins.  *Ibid.*

3       **B.    ANALYSIS**

4       The warden of Pelican Bay State Prison promulgated an operational procedure barring

5   "publications and correspondence written in the languages of Swahili, Nahuatl, Runic or

6   Celtic."  (Decl. Watkins, ex. D.)  Plaintiff contends that his First Amendment rights were

7   violated when he was not allowed to receive in the mail a book called "Myths of Mexico and

8   Peru" because it contained Nahuatl, Mayan and "ancient Peruvian" words.

9       Prisoners retain those First Amendment rights not inconsistent with their status as prison

10  inmates or with legitimate penological objectives of the corrections system.  *Pell v. Procunier*,

11  417 U.S. 817, 822 (1974).  Regulations limiting prisoners' access to publications or other

12  information are valid, however, if they are reasonably related to legitimate penological interests.

13  *Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989) (citing *Turner v. Safley*, 482 U.S. 78, 89

14  (1987)).

15      The Supreme Court recognized in *Turner* that imprisonment does not automatically

16  deprive a prisoner of certain important constitutional protections, including those of the First

17  Amendment, but also that the Constitution sometimes permits greater restriction of such rights

18  in a prison than it would allow elsewhere.  *Beard v. Banks*, 126 S. Ct. 2572, 2577-78 (2006).

19  As was pointed out in *Overton v. Bazzetta*, courts owe "substantial deference to the professional

20  judgment of prison administrators."  539 U.S. 126, 132 (2003).  *Turner* reconciled these

21  principles by holding that restrictive prison regulations are permissible if they are "reasonably

22  related" to legitimate penological interests, and are not an "exaggerated response" to such

23  objectives.  *Turner*, 482 U.S. at 87.

24      In *Turner*, the Supreme Court identified four factors to consider when determining

25  whether a regulation is reasonably related to legitimate penological interests: (1) whether there

26  is a "valid, rational connection between the prison regulation and the legitimate governmental

27  interest put forward to justify it"; (2) "whether there are alternative means of exercising the

28  right that remain open to prison inmates"; (3) "the impact accommodation of the asserted

**United States District Court**
For the Northern District of California

3

United States District Court

For the Northern District of California

1    constitutional right will have on guards and other inmates and on the allocation of prison

2    resources generally"; and (4) the "absence of ready alternatives", or, in other words, whether the

3    rule at issue is an "exaggerated response to prison concerns." *Turner*, 482 U.S. at 89-90.  The

4    *Turner* analysis applies equally to facial and "as applied" challenges.  *Bahrampour v. Lampert*,

5    356 F.3d 969, 975 (9th Cir. 2004).

6          To meet the first *Turner* factor, the governmental interest underlying a regulation

7    restricting prisoners' First Amendment rights must be legitimate and neutral, and the regulation

8    must be rationally related to that objective.  *Thornburgh*, 490 U.S. at 414.  A regulation

9    restricting certain publications is "neutral" if prison administrators draw distinctions between

10   publications solely on the basis of their potential implications for prison security.  *Id.* at 415-16.

11

12         The real task is not balancing the four factors outlined in *Turner*, but rather determining

13   whether the state shows a reasonable relation between the policy and legitimate penological

14   objectives, rather than simply a logical one.  *Beard*, 126 S. Ct. at 2579-80.  The district court

15   must draw all justifiable inferences in the prisoner's favor by distinguishing between evidence

16   of disputed facts and disputed matters of professional judgment.  In respect to the latter, the

17   court's inferences must accord deference to the views of prison authorities.  *Id.* at 2578.  Unless

18   a prisoner can point to sufficient evidence showing the policy is not reasonably related to

19   legitimate penological objectives to allow him to prevail on the merits, he cannot prevail at the

20   summary judgment stage.  *Id.*

21         Defendants assert that publications and communications containing Nahuatl words were

22   banned because that language (and Swahili, Runic and Celtic) was being used by gang members

23   like plaintiff to communicate securely.  They have supported this contention with a declaration

24   from Chief Deputy Warden M. D. Castellaw, who says that prison gang members have "over

25   the last few years" used the banned languages to communicate, endangering the safety of the

26   institution (decl. Castellaw at ¶ 5-6).  Nothing in plaintiff's filings refutes this.

27         It is generally the state's burden to establish a rational relationship between its limiting

28   regulation or policy and the legitimate penological objectives it asserts, *Beard*, 126 S. Ct. at

2581-82, but if there is a "common-sense" connection between the regulation and the objective, the inmate must first show evidence to rebut this reason, and only then does the state have the burden of presenting counter-evidence, *Frost v. Symington*, 197 F.3d 348, 357 (9th Cir. 1999). In this case the undisputed facts are sufficient to meet defendants' burden, plus there is a common-sense connection between the regulation and the objective which has not been rebutted by plaintiff. Defendants have satisfied the first *Turner* factor.

The second *Turner* factor is "whether there are alternative means of exercising the right that remain open to prison inmates." *Turner*, 482 U.S. at 89-90. Consideration of this factor requires that the right in question be viewed sensibly and expansively. *Thornburgh*, 490 U.S. at 417. Regulations restricting certain publications generally will satisfy this factor if they permit "a broad range of publications to be sent, received, and read." *Id.* at 418. The issue is whether there are any alternative means available to the prisoners. *See, e.g., Mauro*, 188 F.3d at 1061 (although policy bans all sexually explicit materials depicting frontal nudity, it does not ban sexually explicit letters between inmates and others, nor does it ban sexually explicit articles or photographs of clothed females); *Stefanow v. McFadden*, 103 F.3d 1466, 1474 (9th Cir. 1996) (even though prisoner banned from reading particular publication, alternative means of exercising First Amendment rights remain available where access to material which does not violate prison security policy unaffected). Given that plaintiff was not barred from reading books in languages other than those banned, defendants have established that this factor cuts in their favor.

The third *Turner* factor is "the impact accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally." Castellaw says in his declaration that if communications in Nahuatl is not banned, it is necessary to look up each word in a dictionary(decl. Castellaw at ¶ 7). The impact of this on the allocation of prison resources is obvious. Thus the result as to the third factor also favors defendants.

The fourth *Turner* factors is whether there are "ready alternatives", or, in other words, whether the rule at issue is an "exaggerated response to prison concerns." There are no obvious

United States District Court

For the Northern District of California

1    ready alternatives that would involve less intrusion on plaintiff's First Amendment rights.

2    ///

3         Plaintiff points out that prison regulations say that mail in languages other than English

4    is permitted, and makes much of the fact that Nahuatl is a "language other than English," not a

5    code.  *See* Cal. Code Regs. tit. 15, § 3146.  This is a distinction without a difference, as the

6    Marine Corps' use of the Navaho Code-Talkers in World War II illustrates.  When a language is

7    sufficiently obscure, it can and does function as a code.  And in any case the state's regulations

8    do not control what First Amendment rights plaintiff has; that is a matter of federal law.

9         Applying that federal law, the Court concludes that the *Turner* factors all clearly favor

10   defendants, so their seizure of plaintiff's books did not violate his First Amendment rights.

11                                      **CONCLUSION**

12        Plaintiff's combined motion to compel, for counsel, and to expedite (document number

13   32 on the docket) is **DENIED**.  For the foregoing reasons, defendants' motion for summary

14   judgment (document number 30) is **GRANTED**.  Plaintiff's cross-motion for summary judgment

15   (document number 38) is **DENIED**.  The clerk shall close the file.

16        **IT IS SO ORDERED.**

17

18   Dated:  September __26__, 2007.                    _____

19                                                      WILLIAM ALSUP
                                                        UNITED STATES DISTRICT JUDGE

20

21

22

23

24

25

26

27

28

                                              6

1

2   G:\PRO-SE\WHA\CR.05\AVILA063.MSJ2.wpd

**United States District Court**
For the Northern District of California